Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| | | |
|---|---|---|
| ETIONY ALDARONDO ANTONINI<br><br>Parte apelante<br><br>v.<br><br>UNIVERSIDAD CARLOS ALBIZU, INC. Y OTROS<br><br>Parte apelada | TA2026AP00201 | *Apelación procedente del Tribunal de Primera Instancia Sala Superior de San Juan*<br><br>Caso Núm. SJ2020CV04175<br><br>Sobre: Incumplimiento de Contrato; Daños |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Ronda Del Toro y la Jueza Lotti Rodríguez

Grana Martínez, Jueza Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 16 de abril de 2026.

El Dr. Etiony Aldarondo Antonini (en adelante, señor Aldarondo o apelante) mediante recurso de *Apelación* presentado el 25 de febrero de 2026, nos solicita que dejemos sin efecto la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala de San Juan (TPI o foro primario) el 30 de enero de 2026, notificada el 2 de febrero de 2026. Mediante el referido dictamen, el foro primario declaró "Ha Lugar" la *Moción de Sentencia Sumaria por Prescripción* que presentó la Universidad Carlos Albizu, Inc. (en adelante, UCA o apelado).

Los hechos que explican la determinación que hoy tomamos se exponen a continuación.

### I.

El 11 de agosto de 2020, el señor Aldarondo instó la *Demanda* de epígrafe en contra de la UCA por alegado incumplimiento

contractual y daños.[1] Los hechos constitutivos a la causa de acción se remontan a diciembre de 2014 cuando integrantes del comité de reclutamiento de la UCA, le hicieron una oferta al señor Aldarondo para que ocupara el cargo de Provost en el Recinto de Miami. Allí, las partes pactaron que el señor Aldarondo obtendría un salario anual de $195,000.00 por sus servicios y adicionalmente cada fin de año recibiría un bono de productividad sujeto a las metas financieras anuales, una compensación especial por los subsidios federales o privados que fueran aprobados posterior a su nombramiento, beneficios marginales y plan médico.

Según expresa el Doctor Aladarondo en su Demanda las discrepancias con el nuevo presidente de UCA, Dr. José Pons (Dr. Pons), comenzaron cuestionándole la publicidad que se daba a los eventos y actividades organizados en el campus de Miami. Incluyendo, entre otros una directriz del Dr. Pons de que estos eventos cesaran a menos que se pudiese justificar el beneficio económico para la universidad. Sostuvo que, en agosto de 2017, el Dr. Pons le pidió alternativas para modificar su contrato. Afirmó que el Dr. Pons se negó a pagarle el incentivo sobre algunas propuestas obtenidas alegando, como pretexto, insubordinación al no obtener la aprobación de la propuesta previamente. Eventualmente, el Dr. Pons también comenzó a exigirle que llevara a cabo tareas, como de finanzas y presupuesto que, no estaban contempladas en su contrato. Detalló en su escrito varias incidencias en las cuales alegó se vio humillado al tener que cancelar eventos, incluso con el entonces gobernador de la Florida que, a su entender, era de beneficio para UCA por la intransigencia del Dr. Pons. Destacó que le hacía responsable por las dificultades económicas que sufría el campus de Miami.

---

[1] Entrada #1 del Sistema Unificado de Manejo y Administración de Casos del Tribunal de Primera Instancia (SUMAC TPI).

En su Contestación a la Demanda, UCA explicó que el Contrato de Empleo fue redactado conforme a las conversaciones previamente sostenidas entre las partes. Puntualizó que a Aldarondo se le instruyó sobre sus responsabilidades como Provost que de forma o manera alguna se limitaban a los aspectos académicos. Por el contrario, como Provost, Aldarondo tenía la responsabilidad, sin que se entienda como limitación alguna, de manejar efectivamente los recursos de la Universidad incluyendo los recursos financieros, reclutamiento y retención de estudiantes. Detallaron que desde que Aldarondo asumió la posición de Provost en Miami, el número de estudiantes y su retención disminuyó, pues este no cumplió con sus deberes contractuales ni con aquellos encomendados posteriormente por el Dr. José Pons Madera.  Esto pues sus acciones no iban dirigidas a añadir valor al Recinto de Miami de la UCA ni a atraer un número significativo de estudiantes, por el contrario, sus acciones u omisiones provocaron consecuencias nefastas en el Recinto de Miami de la UCA. Eventualmente, Aldarondo recibió una amonestación fechada el 20 de junio de 2016 por su dejadez en el cumplimiento de sus responsabilidades y su resistencia para completar tareas asignadas. Para la UCA, Aldarondo creó resistencia en ejecutar las funciones delegadas a éste por el Dr. Pons y se limitó a llevar a cabo y organizar actividades que no tenían el efecto o un efecto mínimo de atraer estudiantes a matricularse en la UCA de Miami, resultando en insubordinación. Particularmente al haber autorizado que se sometieran unas propuestas con el fin único de poder cobrar una comisión por razón de ellas, a pesar de que el Dr. Pons le había instruido que las propuestas no podían ser aprobadas sin su autorización y conocimiento, por entre otras cosas, la preocupación que representaba la comisión de Aldarondo sobre ellas y el estado económico del recinto de Miami.  UCA afirmó que el Dr. Pons le había

instruido a Aldarondo que no se podían someter propuestas sin su consentimiento y sin su autorización. Cabe resaltar que entre las defensas afirmativas presentadas en la contestación a la Demanda UCA incluyó que la Demanda estaba totalmente prescrita.[2]

El 6 de diciembre de 2017, la UCA le informó mediante carta al señor Aldarondo una amonestación escrita luego de haberse llevado a cabo una investigación que reflejó que el señor Aldarondo Antonini incurrió en insubordinación, negligencia y dejadez en el desempeño de sus funciones como Provost.[3] Así las cosas, el 16 de enero de 2018, el señor Aldarondo le cursó una misiva a la UCA mediante la cual notificó su renuncia, la cual fue aceptada el mismo día.[4]

El 28 de agosto de 2018, el representante legal del señor Aldarondo le remitió una reclamación extrajudicial al Dr. Pons y al Dr. González. El 31 de agosto de 2018, la representación legal de la UCA contestó la reclamación extrajudicial descrita en el acápite anterior y aseguró que estarían comunicándose con el señor Aldarondo Antonini dentro de los próximos quince días para discutir el asunto en cuestión. El 25 de septiembre de 2018, los abogados de la UCA y su abogado sostuvieron una reunión de manera presencial en la que discutieron la reclamación extrajudicial.

Dado a que no lograron establecer un acuerdo, 13 de febrero de 2020, el señor Aldarondo presentó una Demanda, caso núm. SJ2020CV01286 en contra de la UCA y ABC Insurance Co. por incumplimiento contractual. Allí, reclamó una compensación de $2,405,372.00, más intereses, costas, gastos y honorarios de abogado. El 6 de agosto de 2020, el TPI emitió una Sentencia mediante la cual desestimó sin perjuicio la Demanda del caso núm.

---

[2] Entrada 26 SUMAC TPI.
[3] Entrada 115 SUMAC TPI, Anejo 8.
[4] Id.

SJ2020CV01286 en virtud de la Regla 69.5 de Procedimiento Civil, 32 LPRA Ap. V.

Ante ello, el 11 de agosto de 2020, el apelante presentó la *Demanda* de epígrafe. El 12 de octubre de 2020, el apelado presentó su *Contestación a la Demanda.*[5] Allí, sostuvo como defensas afirmativas que la *Demanda* está total o parcialmente prescrita.[6] Asimismo, solicitó al foro primario que declare "No Ha Lugar" la Demanda y desestime la misma con perjuicio.

Luego de varios trámites procesales innecesarios de mencionar, el 27 de octubre de 2023, el apelante radicó una *Moción de Sentencia Sumaria Parcial Solicitando la Eliminación de las Defensas Afirmativas* en la *Contestación a Demanda*, incluyendo la de prescripción.[7] Allí se planteó que no había controversia y que la apelada sometió una lista de defensas afirmativas sin incluir hechos ni justificación que sustentaran las mismas en violación de la Regla 6.3 de Procedimiento Civil, 32 LPRA Ap. V, y la jurisprudencia del Tribunal Supremo de Puerto Rico y del Tribunal de Apelaciones. El 20 de noviembre de 2023, la apelada presentó la oposición a dicha Moción de Sentencia Sumaria Parcial del apelante, en la cual sostuvo que la sentencia sumaria no era el mecanismo adecuado para impugnar las defensas afirmativas y que la misma no cumplía con los requisitos de forma, requerido en la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V.[8]

El 11 de diciembre de 2023, el apelado radicó una *Moción de Sentencia Sumaria*, alegando que procedía la desestimación de la demanda porque estaba prescrita.[9] El 15 de enero de 2024, el apelante radicó una *Moción de Desestimación y en Oposición a la*

---

[5] Entrada #7 de SUMAC TPI.
[6] Íd., pág. 32.
[7] Entrada #99 de SUMAC TPI.
[8]  Entrada #108 de SUMAC TPI.
[9] Entrada #109 de SUMAC TPI.

*Moción de Sentencia Sumaria de la Apelada.*[10] Allí planteó nuevamente que procedía la eliminación de las defensas afirmativas ya que no fueron sustentas conforme a las normas de derecho, y, en la alternativa, que procedía la desestimación del escrito de la apelada por carecer de méritos y ser inaplicables las disposiciones citadas. El 26 de enero de 2024, notificada y archivada en autos el 29 de enero de 2024, el TPI dio por sometidas las mociones de sentencia sumaria presentadas por las partes.[11] Dos años después, el 30 de enero de 2026, notificada el 2 de febrero de 2026, el TPI emitió la sentencia objeto del recurso.[12]

En dicho dictamen, el foro primario declaró "Ha Lugar" la *Moción de Sentencia Sumaria por Prescripción* presentada por la UCA. Este razonó que el término prescriptivo que rige a la controversia es el de Ley Núm. 4-2017, *infra,* de un (1) año. Explicó que, si considera que el término se interrumpió con la reclamación extrajudicial enviada en agosto de 2018 y atendida en septiembre de 2018, es claro que pasó más de un año desde la acción interruptora hasta la presentación de la primera demanda. Además, luego de analizar la prueba, el foro primario hizo las siguientes determinaciones de hechos:

### DETERMINACIONES DE HECHOS

1. El 10 de diciembre de 2014, el señor Aldarondo Antonini y el Dr. Angel Collado Schwarz, presidente de la UCA en ese momento, suscribieron el "Employment Agreement for Provost".

2. El término contractual estableció que el señor Aldarondo Antonini fungiría como Provost desde el 1 de julio de 2015 hasta el 30 de junio de 2020.

3. En el Anejo A del acuerdo, se describió la función de Provost como aquella que sirve de director académico para la región de los Estados Unidos y que trabaja de cerca con el presidente para supervisar las políticas y actividades académicas, incluyendo todas las iniciativas regionales que involucre el Recinto de Miami. A continuación de esbozan los deberes que debe ejercer el Provost:

---

[10] Entrada #115 de SUMAC TPI.
[11] Entrada #118 de SUMAC TPI.
[12] Entrada #127 de SUMAC TPI.

a. Asesorar y colaborar estrechamente con el presidente en la planificación, coordinación, y evaluación de programas, al igual que respecto a los procedimientos y actividades académicas.

b. El Provost es responsable de todas las operaciones de la universidad relacionadas al liderazgo académico, el plan de estudios, la investigación y obtención de becas, los servicios estudiantiles y el manejo de personal y grupo académica.

c. Promover los valores y visión institucional, y evaluar las metas y objetivos del plan estratégico mientras supervisa al personal ante su desempeño respecto al plan estratégico.

d. Fomentar la colaboración entre profesores.

e. Gestionar el cumplimiento de la normativa institucional, la legislación y las agencias acreditadoras externas de programas académicos.

f. Mejorar el desempeño en la construcción de una comunidad de académicos en todas las etapas de la carrera académica.

g. Apoyar a entidades y proyectos clínicos y culturales de la universidad.

h. Supervisar y coordinar iniciativas de alcance internacional.

i. Apoyar a profesores, estudiantes y profesionales académicos para promover innovaciones en la enseñanza y el aprendizaje.

j. Cumplir otras funciones relacionadas a la naturaleza del puesto de trabajo que puedan surgir según las necesidades regionales.

4. Las partes acordaron que el señor Aldarondo Antonini obtendría un salario anual de $195,000.00 por sus servicios y adicionalmente cada fin de año recibiría un bono de productividad sujeto a las metas financieras anuales, una compensación especial por los subsidios federales o privados que sean aprobados posterior a su nombramiento y beneficios marginales y plan médico.

5. En cuanto a las causas para terminación contractual, se pactó que la UCA podía terminar el acuerdo en cualquier momento por justa causa escrita y remitida al señor Aldarondo Antonini. El párrafo número cuatro definió justa causa como aquella conducta razonablemente determinada por el presidente y endosada por dos tercios de la mayoría de la junta directiva que incluya: (1) Negligencia crasa; (2) Acciones u omisiones de índole criminal, fraudulenta o que conlleve depravación moral, o (3) Que el señor Aldarondo Antonini haya sido acusado en un tribunal de justicia por delito o crimen relacionado al mal uso o malversación de fondos.

6. En cuanto a la terminación contractual sin justa causa, se dispuso que la UCA puede cancelar el acuerdo con el consentimiento de una mayoría de los votos de los miembros de la junta directiva en cualquier momento y para la conveniencia de la UCA siempre y cuando le notifique por

escrito al señor Aldarondo Antonini con noventa días de anticipación.

7. El párrafo número dieciocho estableció que las leyes del Estado Libre Asociado de Puerto Rico, (en adelante, "ELA"), gobernarán la validez, construcción, interpretación y efecto del acuerdo, y mediante este las partes acuerdan someterse voluntariamente a la jurisdicción de los tribunales del ELA.

8. El 29 de septiembre de 2017, el Dr. Pons le envió una carta al señor Aldarondo Antonini a los fines de darle seguimiento a una conversación telefónica que ambos tuvieron el 27 de septiembre de 2017 respecto a una propuesta de becas sometida a "Health Resources and Services Administration" o HRSA por sus siglas en inglés. Respecto a la llamada telefónica, el Dr. Pons le expresó al Sr Aldarondo lo siguiente:

> Durante la conversación del 27 de septiembre no pudiste justificar que [...] hayas autorizado a la Dra. Barroso a continuar con ese esfuerzo [presentar la propuesta de HRSA sin requerir el pago de la bonificación] sin mi autorización, y sin que se hubiese firmado el acuerdo que tomamos durante la reunión del 15 de agosto. Por lo tanto, la [directora] [de] [los] [programas] [de] [maestría] [del] [recinto] [de] [Miami], Dra. [Diana] Barroso actuó bajo su autorización cuando tú no estabas autorizado para aprobar que se sometiera la propuesta. Dicho de otro modo, en al menos tres o cuatro reuniones u ocasiones en que se continuó discutiendo el tema de tu salario, comenzando con la del 15 de agosto, en repetidas ocasiones te indiqué que la propuesta HRSA no será aprobada por mí hasta que se resolviera el asunto de tu bonificación. A mi entender has incurrido en un acto de insubordinación.

9. Al final de la carta, el Dr. Pons expresó que como el señor Aldarondo Antonini no le entregó el Notice of Award que necesitaba, tuvo que recurrir ante la Dra. Barroso, quien le envió la carta de otorgamiento y la propuesta sometida.

10. El 25 de octubre de 2017, el señor Aldarondo Antonini le respondió al Dr. Pons y, en resumen, rechazó todas las aseveraciones allí contenidas, particularmente, la expresión que hizo en torno al acto de insubordinación y negligencia debido a que los hechos y los términos contractuales revelan lo contrario.

11. El 6 de diciembre de 2017, la UCA le informó mediante carta al señor Aldarondo Antonini una amonestación escrita luego de haberse llevado a cabo una investigación que reflejó que el señor Aldarondo Antonini incurrió en insubordinación, negligencia y dejadez en el desempeño de sus funciones como Provost. En específico, se concluyó que el señor Aldarondo Antonini incurrió en negligencia crasa en el manejo de los datos y asuntos relacionados a las admisiones de estudiantes del Recinto de Miami.

12. El 10 de diciembre de 2017, el señor Aldarondo Antonini respondió a la referida amonestación escrita, y negó que incurrió en conducta negligente y de insubordinación. También, cuestionó la existencia y validez de la investigación aludida y alegó que es la UCA y el Dr. Pons quienes han violado las disposiciones contractuales y le han impuesto deberes adicionales que no le corresponden.

13. El 16 de enero de 2018, el señor Aldarondo Antonini le cursó una misiva a la Junta de Síndicos de la UCA mediante la cual notificó su renuncia, efectiva el 1 de febrero de 2018, como Provost del Recinto de Miami y fundamentó su decisión en que debía proteger su salud y reputación profesional. La renuncia fue aceptada el mismo día por el Dr. Pons, quien extendió su compensación hasta el 1 de febrero de 2018.

14. El 28 de agosto de 2018, el representante legal del señor Aldarondo Antonini, Godwin Aldarondo Girald, le remitió una reclamación extrajudicial al Dr. Pons y al Dr. González.20 En términos generales, la carta consistió en un recuento de la experiencia laboral del señor Aldarondo Antonini como Provost, de ejemplos de la presunta conducta de acoso exhibida por el Dr. Pons hacia el señor Aldarondo Antonini, e incluyó un listado de las cuantías reclamadas por los alegados daños ocasionados a consecuencia del presunto incumplimiento contractual en el que incurrió la UCA.

15. El 31 de agosto de 2018, la representación legal de la UCA contestó la reclamación extrajudicial descrita en el acápite anterior y aseguró que estarían comunicándose con el señor Aldarondo Antonini dentro de los próximos quince días para discutir el asunto en cuestión.

16. El 25 de septiembre de 2018, los abogados de la UCA y su abogado sostuvieron una reunión de manera presencial en la que discutieron la reclamación extrajudicial.

17. El 13 de febrero de 2020, el señor Aldarondo Antonini presentó una Demanda, caso núm. SJ2020CV01286 en contra de la UCA y ABC Insurance Co. por incumplimiento contractual. Allí, reclamó una compensación de $2,405,372.00, más intereses, costas, gastos y honorarios de abogado.

18. El 6 de agosto de 2020, la Hon Jueza Superior Waleska I. Aldebol Mora, emitió una Sentencia mediante la cual desestimó sin perjuicio la Demanda del caso núm. SJ2020CV01286 en virtud de la Regla 69.5 de Procedimiento Civil, supra.

Inconforme con el proceder del TPI, el apelante acudió ante este Tribunal mediante recurso de Apelación y señala los siguientes errores:

Erró el Honorable TPI al darle un efecto extraterritorial a la Ley 4 de 2017 y que por ello la Demanda estaba Prescrita. Esta interpretación resulta inconstitucional.

Erró el TPI al darle efecto retroactivo a la Ley 4, de 2017, incorporando la misma a un contrato redactado por la parte demandada y firmado varios años antes de aprobarse dicha ley. La ley 4 no tiene efectos retroactivos.

Erró el TPI al no aplicar el término prescriptivo del estado de la Florida de cinco (5) años.

Erró el Honorable TPI al Declarar No Ha Lugar la "Moción de Sentencia Sumaria Parcial …" del Apelante

Sin Considerar el Planteamiento de que se Eliminaran las Defensas Afirmativas. El fundamento fue que "la Sentencia Sumaria No fue el mejor Método para Solicitar Dicha Eliminación" y porque la Misma "Carecía de las formalidades" que exige el Ordenamiento Jurídico al Respecto.

Erró el Honorable TPI al No Considerar Ni Atender la Oposición a Sentencia Sumaria del Apelante donde se reiteró el que la defensa de prescripción fue renunciada.

De otro lado, el 30 de marzo de 2026, la UCA presentó su *Oposición a la Apelación.*

## II.

### A. Sentencia Sumaria

Nuestro ordenamiento procesal civil reconoce el uso y valor que tiene la sentencia sumaria para asegurar una solución justa, rápida y económica de los casos. *Conklin v. Passalacqua,* 2026 TSPR 18, 217 DPR ___, 4 (2026); *Vera v. Dr. Bravo*, 161 DPR 308, 321-322 (2004). La herramienta procesal de la sentencia sumaria posibilita la pronta resolución de una controversia que no presenta disputa genuina de hechos materiales y, por lo tanto, no ameritan la celebración de un juicio en su fondo ya que lo único que resta es dirimir una controversia de derecho. Id.

Para que proceda una adjudicación por la vía sumaria es necesario que, de los documentos no controvertidos, surja qué no hay controversia real sobre los hechos materiales del caso que a la luz del derecho sustantivo determinaría que se dicte sentencia a su favor. Un hecho material es aquel que puede afectar el resultado de la reclamación, de acuerdo con el derecho sustantivo aplicable. Si hay una disputa real y sustancial sobre la existencia de algún hecho material, el tribunal se debe apartar de la adjudicación sumaria. *Conklin v. Passalacqua, supra.*

Para resumir; una moción de sentencia sumaria no procederá cuando: (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no han sido

refutadas; (3) surja de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial; o (4) no proceda como cuestión de derecho. *Conklin v. Passalacqua, supra*; *Universal Ins. y otro v. ELA y otros,* 211 DPR 455, 471-472 (2023).

Además, la regla 36 de Procedimiento Civil, 32 LPRA Ap. V, sobre la sentencia dictada sumariamente permite que se dicte sentencia sumaria contra una parte sin necesidad de juicio sujeto al cumplimiento de ciertos requisitos. En particular, la Regla 36 de Procedimiento Civil, *supra*, dispone que:

> Una parte que solicite un remedio podrá presentar, en cualquier momento después de haber transcurrido veinte (20) días a partir de la fecha en que se emplaza a la parte demandada, o después que la parte contraria le haya notificado una moción de sentencia sumaria, pero no más tarde de los treinta (30) días siguientes a la fecha límite establecida por el tribunal para concluir el descubrimiento de prueba, una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación solicitada.

Por su parte la Regla 36.3 de Procedimiento Civil, *supra,* contiene los requisitos de forma para instar una moción de sentencia sumaria y su respectiva oposición. La parte que sostenga la inexistencia de una controversia sustancial de hechos esenciales y pertinentes debe presentar una moción que se funde en declaraciones juradas u otra evidencia admisible. Además, tanto la moción como la oposición deberán cumplir con el orden establecido en la Regla 36.3, *supra.*

En cuanto al uso de declaraciones juradas en apoyo u oposición a la moción de sentencia sumaria se ha establecido que estas tienen que estar basadas en el conocimiento personal del o de la declarante, contener hechos admisibles en evidencia y demostrar que el declarante está cualificado para declarar sobre su contenido. Regla 36.5 de Procedimiento Civil, *supra.* El Tribunal Supremo de

Puerto Rico resolvió en *Ramos Pérez v. Univisión,* 178 DPR 200, 216 (2010), que las declaraciones juradas con solo conclusiones y sin hechos específicos que las apoyen, no tienen valor probatorio y son insuficientes para demostrar la existencia de lo que allí se concluye. Las declaraciones juradas que son meramente conclusiones reiteradas de las alegaciones de la demanda y hechas sin conocimiento personal, son insuficientes para derrotar una moción de sentencia sumaria.

En cuanto a la revisión de la acogida o no de una solicitud de sentencia sumaria el Tribunal de Apelaciones se encuentra en la misma posición que el TPI, al momento de revisar las solicitudes. Al igual que el TPI tiene que regirse por la Regla 36, *supra,* y aplicar los criterios que esa regla y su jurisprudencia interpretativa exigen. Ambos foros tienen que revisar que la moción de sentencia sumaria y su oposición cumplan los requisitos de forma codificados en la Regla 36 de Procedimiento Civil, *Conklin v. Passalaqua, supra; Negro Castro et al. v. SLG et al.*, 2025 TSPR 96, 216 DPR _____ (2025); *Batista v. Sucn. Batista et al.*, 2025 TSPR 93, 216 DPR ___ (2025).

Ahora bien, en el análisis del foro revisor, no se podrá considerar evidencia que las partes no presentaron en el TPI. La revisión del Tribunal de Apelaciones es un juicio de novo. El foro apelativo debe examinar el expediente de la manera más favorable para la parte opositora a la moción de sentencia sumaria y hacer todas las inferencias permisibles a su favor. *Batista v. Sucn. Batista et al., supra*; *Rivera Matos et al. v. Triple-S et al.*, 204 DPR 1010, 1025 (2020); *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 118 (2015).

## B. Doctrina General de los Contratos

El Código Civil de Puerto Rico de 1930[13], vigente al momento de la firma del contrato cuyo incumplimiento se sostiene en la demanda objeto de este recurso, establecía el origen de las obligaciones en su Artículo 1042 especificando que, "[l]as obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia". 31 LPRA sec. 2992.[14] En nuestro ordenamiento se reconoce el contrato como fuente de obligación. Aquellas obligaciones que surjan como consecuencia de un contrato tienen fuerza de ley entre las partes, por lo que, estas vienen obligadas a cumplir con lo acordado. Art. 1044 del Código Civil de 1930, 31 LPRA sec. 2994.[15]

La existencia de un contrato está sujeta a la necesaria concurrencia de los requisitos de consentimiento, objeto y causa de la obligación que se establezca. Art. 1213 del Código Civil, 31 LPRA sec. 3391. Asimismo, el Artículo 1207 del Código Civil, les otorga cierta flexibilidad a los contratantes al redactar "los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público". 31 LPRA sec. 3372.[16] Una vez perfeccionado, el mismo no sólo obliga a lo expresamente pactado, sino también a todas sus consecuencias

---

[13] Aunque el Código Civil de 1930 fue derogado al aprobarse el Código Civil de 2020, Ley Núm. 55 de 1 de junio de 2020, según enmendada, hacemos referencia al estatuto anterior por ser el aplicable al momento de la contratación.

[14] El Código Civil de 2020, a los efectos dispone: Son fuentes de obligaciones: (a) la ley; (b) los contratos; (c) los cuasicontratos; (d) los actos ilícitos; (e) los actos u omisiones en que interviene culpa o negligencia; y (f) cualquier otro acto idóneo para producirlas, de conformidad con el ordenamiento jurídico. 31 LPRA sec. 8984.

[15] Sobre la fuerza vinculante de la contratación el Código Civil de 2020 dispone: Lo acordado en los contratos tiene fuerza de ley entre las partes, ante sus sucesores y ante terceros en la forma que dispone la ley. 31 LPRA sec. 9754.

[16] Sobre la libertad contractual el Código Civil 2020 dispone: Es facultativo contratar o no hacerlo, y hacerlo, o no, con determinada persona. Estos derechos no pueden ejercerse abusivamente ni contra una disposición legal. Las partes pueden acordar cualquier cláusula que no sea contraria a la ley, a la moral o al orden público. En los contratos el juramento se tiene por no escrito.31 LPRA sec. 9753.

según sea conforme a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, 31 LPRA sec. 3375.

### C. Cláusula de selección de foro

Se ha reconocido como parte de las facultades de los contratantes, el poder plasmar su voluntad e intención de escoger una cláusula para determinar el foro o el derecho aplicable en casos de que surjan controversias. *Merchant Advance, LLC v. Conceptos Cuisine, LLC*, 2026 TSPR 15 (2026); *Bobé et al. v. UBS Financial Services,* 198 DPR 6, 15-16 (2017). Estas cláusulas contractuales de selección de foro son válidas, siempre y cuando no se derrote su presunción de validez y razonabilidad. A esos efectos, aquel que busque derrotar dicha presunción, tiene el peso de la prueba para demostrar su invalidez. *Unisys v. Ramallo Brothers*, 128 DPR 842, 857 (1991). Al hacer valer una cláusula de selección de foro se protegen los intereses legítimos de las partes, sus expectativas y, sobre todo, fomenta los intereses vitales del sistema de justicia. Íd., págs. 856-857.

En *Unisys v. Ramallo Brothers*, *supra,* pág. 857, el Tribunal Supremo de Puerto Rico expuso los criterios a evaluar al examinar la no aplicabilidad de la cláusula de selección de foro, entre estos: 1) [e]l foro seleccionado resulta ser irrazonable e injusto; 2) [d]e ventilarse el caso en dicho foro, se incurriría en una clara y patente inequidad, o sería irrazonable o injusto; 3) [l]a cláusula no es válida porque fue negociada mediando fraude o engaño; 4) [l]a implantación de dicha cláusula derrotaría la política pública del Estado.

Además, la parte que impugne el foro seleccionado deberá demostrar que permea una inconveniencia tan grave que, para todos los propósitos prácticos, sería privado de su día en corte". *Abengoa, S.A. v. American Intl. Ins.,* 176 DPR 512, 522 (2009). No obstante, "si la cláusula de selección de foro fue producto de la negociación entre

los contratantes, quienes tuvieron que considerar las ventajas y desventajas del foro seleccionado, no es suficiente alegar que ese foro es inconveniente para que un tribunal decrete su inaplicabilidad". *Bobé et al. v. UBS Financial Services*, *supra,* pág. 16.

### D. Prescripción

La prescripción extintiva es una figura de derecho sustantivo que extingue el derecho a ejercer una causa de acción por la inacción de una parte durante un tiempo determinado. *Nevárez Agosto v. United Surety et al.,* 209 DPR 346, 356 (2022). La prescripción es una institución de derecho civil sustantivo y no procesal, que obedece a una finalidad pública de darle seguridad a las relaciones jurídicas. *Maldonado Rivera v. Suaréz y otros,* 195 DPR 182, 193 (2016).

El Código Civil de Puerto Rico de 1930, ley aplicable para el presente caso, establece en su Artículo 1873 que la prescripción de las acciones, "se interrumpe por su ejercicio ante los tribunales, por reclamación extrajudicial del acreedor y por cualquier acto de reconocimiento de la deuda por el deudor". 31 LPRA sec. 5303. En esencia, la prescripción tiene como fin castigar la inactividad de ejercer las causas de acción y evitar litigios que sean difíciles de adjudicar debido a la antigüedad de las reclamaciones. *SLG García - Villega v. ELA et al.*, 190 DPR 799, 813 (2014).

### E. Ley de Transformación y Flexibilidad Laboral

La Ley Núm. 4 de 26 de enero de 2017, 29 LPRA sec. 121 *et seq.,* mejor conocida como la *Ley de Transformación y Flexibilidad Laboral* se creó a los fines de establecer, entre otras cosas, las normas aplicables al contrato de empleo en Puerto Rico. El Artículo 1.2 de la aludida ley establece que "[l]os empleados contratados con anterioridad a la vigencia de esta Ley, continuarán disfrutando los mismos derechos y beneficios que tenían previamente, según lo

dispuesto expresamente en los Artículos de ésta". 29 LPRA sec. 121a. Ahora bien, en lo pertinente a la controversia que nos ocupa, el Artículo 2.18 de la Ley Núm. 4-2017, 29 LPRA sec. 122q, dispone que:

> Las acciones derivadas de un contrato de empleo o los beneficios que surgen en virtud de un contrato de empleo, **prescribirán al año, contado a partir del momento en que se pueda ejercer la acción**, a menos que se disponga expresamente de otra manera en una ley especial o en el contrato de empleo. No obstante, las causas de acción surgidas previo a la vigencia de esta Ley, tendrán el término prescriptivo bajo el ordenamiento jurídico anterior aplicable. (Énfasis suplido).

### F. Defensas afirmativas

Las defensas afirmativas principalmente comprenden materias sustantivas y/o constitutivas de excusas, por las cuales la demandada no debe responder a las reclamaciones en su contra. *Conde Cruz v. Resto Rodríguez et al.,* 205 DPR 1043, 1063 (2020).

La Regla 6.3 de Procedimiento Civil, *supra*, contiene las defensas afirmativas que puede plantear la parte a quien corresponda presentar una alegación responsiva, entre ellas la prescripción adquisitiva o extintiva. Las defensas afirmativas tienen que plantearse en forma clara, expresa y específica en la respuesta, porque, de lo contrario, se tendrán renunciadas. Íd. Es decir, como norma general, el demandado que no incluye una defensa afirmativa en la contestación a la demanda, renuncia a ésta y no podrá plantearla en una etapa posterior del proceso judicial. Véase, *Díaz Ayala et al. v. E.L.A.,* 153 DPR 675, 696 (2001). No obstante, pueden ser incluidas mediante enmienda, cuando se conoce su existencia durante el descubrimiento de prueba. Regla 6.3 de Procedimiento Civil, *supra.* En fin, cuando su omisión no se debió a falta de diligencia. *Meléndez v. El Vocero de Puerto Rico,* 144 DPR 389, 399 (1997).

**III.**

El apelante alega que el foro primario incidió al desestimar la demanda por prescripción al darle un efecto extraterritorial a la Ley Núm. 4-2017, *supra.* Además, sostiene que erró el TPI al aplicar retroactivamente la Ley Núm. 4-2017*, supra,* y al incorporar la misma a un contrato redactado por el apelado y firmado varios años antes de aprobarse dicha ley. En cambio, este plantea que el término prescriptivo que debió aplicarse es el del estado de la Florida de cinco (5) años o en la alternativa el de 15 años. Por último, aduce que incidió el foro primario al no considerar ni atender la *Oposición a Sentencia Sumaria,* en el cual se reiteró el que la defensa de prescripción fue renunciada.

A modo de repaso, la UCA y el señor Aldarondo suscribieron un Contrato de Empleo titulado "Employment Agreement for Provost" firmado el 10 de diciembre de 2014.[17] Mediante dicho contrato, la UCA y el señor Aldarondo acordaron que las leyes de Puerto Rico regirían la relación contractual. En específico, hacemos notar que la cláusula dieciocho dispone que *"[t]he laws of the Commonwealth of Puerto Rico shall govern the validity, construction, interpretation and effect of this entire Agreement.* […]".[18] Igualmente, las partes acordaron en el mismo contrato que los Tribunales de Puerto Rico serían los foros con jurisdicción para atender cualquier controversia que surgiera relacionada al referido contrato.

Ante el supuesto incumplimiento de UCA con el contrato sobre las bonificaciones o compensación adicional con el apelante, este optó por renunciar a su puesto. El 16 de enero de 2018, la UCA aceptó la renuncia con efectividad al 17 de enero de 2018. Así las cosas, la representación legal del señor Aldarondo envió una reclamación extrajudicial el 28 de agosto de 2018, la cual fue

---

[17] Entrada #109, Anejo 2 de SUMAC TPI.
[18] Íd.

contestada o atendida el 25 de septiembre de 2018. Si contamos el término prescriptivo de la forma más beneficiosa al apelante, sería a partir de la fecha en que se contestó su reclamación extrajudicial.

No obstante, no fue hasta el 13 de febrero de 2020, casi un (1) año y cinco (5) meses después de que se rechazó la reclamación extrajudicial, cuando el señor Aldarondo instó la primera *Demanda* en el TPI en contra del apelado, caso número SJ2020CV01286, sobre violación de contrato y daños.[19] El 6 de agosto de 2020, notificada el 7 de agosto de 2020, el TPI dictó Sentencia desestimando, sin perjuicio dicha demanda.[20] Según surge del expediente, este fue desestimado sin perjuicio por no haberse prestado fianza de no residente de conformidad con la Regla 69.5 de Procedimiento Civil, *supra.* Es de notar que el asunto de la prescripción no se planteó ni se consideró en dicho caso, toda vez que la desestimación ocurrió antes de que si quiera se expidiera el emplazamiento a UCA.

Ahora bien, nos corresponde determinar si la Ley Núm. 4-2017, *supra,* es de aplicación al caso de autos y, por ende, el término prescriptivo allí dispuesto, a saber, el de un (1) año. Véase Art. 2.18, *supra.* Según dispone el Artículo 7.3 de la misma ley, esta entró en vigor desde su aprobación el 26 de enero de 2017. Si bien es cierto que la aludida ley no estaba vigente al momento que se firmó el contrato, lo que resulta verdaderamente pertinente para determinar la prescripción es el momento en que la parte tenga a su favor alguna reclamación, o sea, el momento en que nace a la vida su alegada causa de acción.

En este caso, el señor Aldarondo renunció a su puesto el 16 de enero de 2018, fecha en la que conforme a sus alegaciones podía ejercer su causa de acción. Siendo aprobada su renuncia el 17 de

---

[19] Íd., Anejo 7.
[20] Íd., Anejo 8.

enero de 2018 la Ley Núm. 4-2017, *supra,* era el estatuto vigente, por lo cual el término prescriptivo es de un año a partir del momento en que se pueda ejercer la causa de acción. Por tanto, al apelante presentar su primera demanda casi un (1) año y cinco (5) meses después de que se rechazó la reclamación extrajudicial, no albergamos duda que la acción se encuentra prescrita.

Según reseñamos, la UCA y el señor Aldarondo acordaron que las leyes de Puerto Rico son las que regirían la relación contractual, así como que los Tribunales de Puerto Rico serían los foros con jurisdicción. En materia de contratos, se ha reconocido a las partes el poder plasmar su voluntad e intención de escoger una cláusula para determinar el foro o el derecho aplicable en casos de que surjan controversias. *Merchant Advance, LLC v. Conceptos Cuisine, LLC, supra; Bobé et al. v. UBS Financial Services, supra.* Estas cláusulas contractuales de selección de foro son válidas, siempre y cuando no se derrote su presunción de validez y razonabilidad. En el caso de autos, el señor Aldarondo no pudo demostrar que esta cláusula fuese inconveniente o irrazonable, todo lo contrario, refleja la intención de las partes. Por tanto, es improcedente el planteamiento del apelante de que debió aplicarse el término prescriptivo de cinco (5) años del estado de la Florida.

Por último, no le asiste la razón al apelante en cuanto a que la prescripción como defensa afirmativa fue renunciada por el apelado. La Regla 6.3 de Procedimiento Civil, *supra,* lo que requiere es que estas defensas se indiquen en forma clara, expresa y específica al responder a una alegación o se tendrán por renunciadas. Contrario a las alegaciones de una demanda y/o de una reconvención, estas defensas no deben ser evaluadas bajo el mismo estándar de suficiencia y especificidad, ya que su propósito y efecto es distinto.

En el presente caso, el apelado dispuso en su *Contestación a la Demanda* que "[l]a Demanda está totalmente prescrita. . . [l]a Demanda está parcialmente prescrita".[21] Por lo tanto, UCA cumplió con el requisito de alegar la defensa afirmativa de prescripción de forma clara, inequívoca y especifica. Pues, este invocó la defensa en su primera alegación responsiva, lo que significa que cumplió con los únicos requisitos que exige la Regla 6.3 de Procedimiento Civil, *supra.*

De todo lo anterior, resolvemos que el foro primario no erró al declarar "Ha Lugar" la *Moción de Sentencia Sumaria por Prescripción* presentada por la UCA. Así pues, a la *Demanda* del epígrafe encontrarse prescrita, correctamente el TPI la desestimó en su totalidad con perjuicio.

**IV.**

Por los fundamentos expresados, se confirma la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[21] Entrada #7 de SUMAC TPI, pág. 32.